**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FLOWERS GINNING COMPANY,
INCORPORATED, d/b/a Warren
Brothers Gin,
<u>Plaintiff-Appellee,</u>

No. 96-1314

v.

ARMA, INCORPORATED; RITCH
MCCUTCHEN,
<u>Defendants-Appellants.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Fayetteville.
Alexander B. Denson, Magistrate Judge.
(CA-94-46-3-DE)

Argued: December 4, 1996

Decided: January 24, 1997

Before WIDENER and HAMILTON, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion. Judge Widener wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Frederick Lewis Wright, II, SMITH, CURRIE & HAN-
COCK, Atlanta, Georgia, for Appellants. Gordon Claiborne Wood-
ruff, Smithfield, North Carolina, for Appellee. **ON BRIEF:** Stephen

Gregory Joy, SMITH, CURRIE & HANCOCK, Atlanta, Georgia;
Steven Craig Lawrence, ANDERSON, JOHNSON, LAWRENCE,
BUTLER & BOCK, Fayetteville, North Carolina, for Appellants.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

ARMA, Inc. (ARMA), a distributor of cotton ginning equipment,
appeals the magistrate judge's denial of its motion for judgment as a
matter of law, or in the alternative for a new trial, see Fed. R. Civ.
P. 50, following a jury verdict in favor of Flowers Ginning Company,
Inc. (Flowers Ginning), a company which had purchased certain gin-
ning equipment from ARMA. We affirm.

I.

Flowers Ginning is a North Carolina corporation which operated a
cotton gin in Newton Grove, North Carolina, from 1986 to 1994.
Glenn Flowers was the sole shareholder in Flowers Ginning and con-
tinually served as its president. Charlie Warren and Tommy Warren
(the Warren brothers), Glenn Flowers' nephews, conducted the day-
to-day operations of Flowers Ginning. ARMA is a Georgia corpora-
tion with its principal place of business in Cordele, Georgia. ARMA
sells and installs new and used cotton ginning equipment.

In 1991, Flowers Ginning decided to purchase a universal density
(UD) cotton press and other related equipment in order to serve the
needs of its customers as well as meet new cotton ginning volume
expectations during a boom year for cotton production. Accordingly,
ARMA and Flowers Ginning began discussing a deal whereby Flow-
ers would purchase the UD press and related equipment from ARMA.
In light of this contemplated deal, Flowers Ginning began informing

2

its customers about its upcoming increased capacity for production and apparently secured oral commitments to gin 12,314 bales of cotton for the 1991 ginning season.

During the second week of July 1991, Flowers Ginning contacted Southern National Bank (Southern National) to discuss financing for the contemplated equipment purchase from ARMA. On August 19 or August 20, Southern National indicated to Flowers Ginning that it was prepared to make the loan. Accordingly, on or about August 20, Flowers Ginning contacted ARMA's president, Ritch McCutchen (McCutchen), to advise him that it had arranged financing and stood ready to purchase the UD press and other related equipment.

On August 21, McCutchen drafted the written contract at issue here, signed it, and flew to North Carolina to secure Glenn Flowers' signature. For reasons not fully explained in the record, Glenn Flowers was not available to sign the contract that day. Therefore, McCutchen left the contract with Flowers Ginning in North Carolina for Glenn Flowers' signature. The written contract provided that some of the equipment would be delivered immediately; that other equipment would be delivered approximately thirty days from the date the contract was signed; and that other equipment would be delivered within ninety days. Glenn Flowers signed the contract on August 22. That same day, Southern National issued commitment papers for the loan.

On August 26, 1991, Glenn Flowers, the Warren brothers, and Flowers Ginning's corporate attorney, Miles B. Fowler (Fowler), met with Richard DeBose (DeBose), a Southern National executive. According to Flowers Ginning, during a telephone call between DeBose and McCutchen that took place during this meeting, DeBose expressed his desire that the equipment be installed and operational in time for the 1991 ginning season. DeBose's desire rested on his concern that Flowers Ginning would be otherwise unable to repay the loan. DeBose and McCutchen then allegedly agreed that ARMA would have the UD press and related equipment installed and operational by October 1. DeBose then reported McCutchen's agreement to an October 1 installation and operational deadline to Glenn Flowers and the Warren brothers who were present at the meeting.

In completing the loan closing, DeBose relied heavily on McCutchen's promise to have the UD press and related equipment installed

3

and operational by October 1. In addition, Flowers Ginning authorized Southern National to disburse funds to ARMA only after McCutchen promised to have the UD press and related equipment installed and operational by October 1. At the trial however, McCutchen testified that he and DeBose never discussed ARMA having the UD press and related equipment installed and operational by October 1 and that he did not know that Glenn Flowers and the Warren brothers were in the room during his August 26 telephone conversation with DeBose.

On August 27, 1991, Flowers Ginning, through Southern National, paid ARMA the earnest money called for in the contract. ARMA nonetheless failed to have the equipment installed and operational by October 1. ARMA provided all of the equipment subject to the contract by November 12, 1991, a date within the delivery schedule called for in the original written contract as signed by McCutchen and Glenn Flowers.

Flowers Ginning subsequently filed suit against ARMA in the United States District Court for the Eastern District of North Carolina. The suit alleged claims for breach of contract, fraud, civil conspiracy, recision, and unfair trade practices. Flowers Ginning sought compensatory damages for: (1) costs it incurred in completing the installation of the UD press and related equipment; and (2) for lost profits that allegedly resulted from ARMA's failure to have the ginning equipment installed and operational by October 1. Specifically, Flowers Ginning determined that it incurred a total of $183,255 for expenses and improvements to finish installing the UD press and related equipment and make the completed gin operational. (J.A. 545-46). In addition, because Flowers Ginning could not conduct ginning operations for the Fall 1991 ginning season, it could not carry through with its commitments to gin 12,314 bales of cotton. For that season and succeeding years, Flowers Ginning asserted lost calculable profits of over $200,000. (J.A. 554, 570-74, 939).

Following discovery, ARMA filed a motion for summary judgment, which the district court granted in part and denied in part. Accordingly, the district court entered judgment for ARMA on Flowers Ginning's claim for civil conspiracy, but allowed the breach of contract, fraud, recision, and unfair trade practices claims to be tried

4

before a jury. Then the parties consented to trial of this matter before a United States Magistrate Judge. See 28 U.S.C. § 636(b)(2) (1990).

Subsequently, ARMA filed a motion in limine to exclude any evidence that the parties orally agreed to modify the contract to set an October 1 installation and operational deadline, rather than a November 19 installation and operational deadline.[1] In support of the motion, ARMA argued that the statute of frauds and the parol evidence rule as contained in the Georgia Commercial Code (GCC), see Ga. Code Ann. §§ 11-2-201 to 202, barred any evidence of an oral modification before August 27, the date Flowers Ginning paid ARMA the "earnest money."[2] Determining that August 21 constituted the effective date of the contract rather than August 27, the magistrate judge denied ARMA's motion. The case then proceeded to trial.

At the close of Flowers Ginning's case, ARMA made a motion for judgment as a matter of law, see Fed. R. Civ. P. 50(a), which the magistrate judge denied. Flowers Ginning then withdrew its recision claim, leaving only its claim for breach of contract against ARMA and its claims for fraud and unfair trade practices against both ARMA and McCutchen. At the close of all the evidence, ARMA renewed its motion for judgment as a matter of law. The magistrate judge denied the renewed motion.

The case proceeded to the jury, which returned a verdict in favor of Flowers Ginning on its breach of contract claim against ARMA and on its unfair trade practices claim against ARMA and McCutchen. Conversely, the jury found in favor of ARMA and McCutchen on Flowers Ginning's fraud claims. The jury awarded $330,555 on

---

[1] The ninety day installation and operational deadline provided in the written contract fell on November 19, 1991.

[2] ARMA claimed: (1) without the payment of the earnest money there was no contract, therefore, the contract did not come into effect until August 27, 1991; (2) the only evidence of any oral modification to the contract occurred prior to the payment of the earnest money, and therefore, any evidence of an oral modification should have been excluded as parol; and (3) without any oral modification, there was no breach because it fulfilled its obligations under the contract by November 19, 1991.

5

the breach of contract claim against ARMA and $1 on the respective unfair trade practices claims against ARMA and McCutchen. Finding insufficient evidence as a matter of law to support the jury's verdict against either defendant for unfair trade practices, the magistrate judge entered judgment in favor of both ARMA and McCutchen on those claims. The magistrate judge did not disturb the jury's verdict on the breach of contract claim.

ARMA subsequently filed a motion for judgment as a matter of law or in the alternative for a new trial, see Fed. R. Civ. P. 50(b), on two grounds. First, ARMA contended that the magistrate judge erroneously allowed the admission of evidence relating to oral contract modifications occurring before August 27, 1991, and without that evidence no reasonable jury could have found it liable for breach of contract. Second, and in the alternative, ARMA contended that even if it breached the contract, Flowers Ginning presented insufficient evidence to support the damage award on the breach of contract claim. The magistrate judge denied the motion. ARMA timely appealed.[3]

II.

ARMA first argues that the magistrate judge's decision to instruct the jury on the GCC, as opposed to Georgia's general contract law, was erroneous.[4] We disagree.

When the magistrate judge instructed the jury on the applicable

_____

[3] Technically, both ARMA and McCutchen appealed the magistrate judge's denial of the motion for judgment as a matter of law, see Fed. R. Civ. P. 50(b). However, once the magistrate judge dismissed the unfair trade practices claim against McCutchen, there was no judgment against him and nothing for him to appeal. Accordingly, throughout this opinion, we refer to ARMA as the only appealing party.

[4] ARMA presumably argues for the application of Georgia general contract law because, as opposed to the GCC, Georgia general contract law arguably contains: (1) stricter requirements for contract formation; (2) a more rigorous parol evidence rule; and (3) a narrower definition of what can constitute compensatory damages once there has been a breach of contract.

law, he framed the case for the jury in terms of the GCC.**5** However, ARMA did not object to the magistrate judge's instructions.

It is settled law that in order to properly preserve an objection to jury instructions, a party must state "distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51; see Mattison v. Dallas Carrier Corp., 947 F.2d 95, 112 (4th Cir. 1991). Because ARMA never objected to the magistrate judge's instructions to the jury on the GCC rather than general Georgia contract law, ARMA failed to preserve that issue for appeal. In any event, the magistrate judge correctly determined that the GCC applied to resolve the breach of contract claim.

Article 2 of the GCC applies to all "transactions in goods," Ga. Code Ann. § 11-2-102, and defines "goods" as all things which were moveable at the time those things were identified to the contract. Ga. Code Ann. § 11-2-105(1). According to Georgia law, "[w]hen the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the [GCC] applies, `even though a substantial amount of service is to be rendered in installing the goods.'" J. Lee Gregory, Inc. v. Scandinavian House, 433 S.E.2d 687, 689 (Ga. Ct. App. 1993) (quoting Anderson, Uniform Commercial Code, § 2-104:38); see also Beaulieu of Am., Inc. v. Coronet Ind., Inc., 327 S.E.2d 508, 510 (Ga. Ct. App. 1985). Only when the predominant element of the contract is the furnishing of services should the contract be viewed as a service contract, thus requiring the application of Georgia general contract law. See, e.g., Mail Concepts v. Foote & Davies, Inc., 409 S.E.2d 567 (Ga. Ct. App.), cert. denied, 200 Ga. App. 896 (1991).

Here, the contract dispute arose over the installation of the UD press and related equipment. Nevertheless, the sale of the UD press and related equipment always constituted the predominant object of the contract. Effectively, the installation amounted to nothing more than a particularized mode and method of delivery. Because the sale of the UD press and related equipment constituted the predominate object of the contract, the GCC applied to resolve Flowers Ginning's breach of contract claim.

_____
**5** The parties agree that Georgia law applies to this case.

7

III.

Next, ARMA challenges the magistrate judge's decision to admit evidence that the parties modified the contract on August 26 to set an October 1 installation and operational deadline. According to ARMA, both the statute of frauds and the parol evidence rule as contained in the GCC barred any evidence that the parties orally modified the contract. See Ga. Code Ann. §§ 11-2-201 to 202. We review evidentiary rulings for an abuse of discretion. See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 126 (4th Cir. 1995). "The legal standards the district court applies in making its evidentiary rulings, however, are reviewed de novo." Id.

A.

ARMA argues that the admission of the evidence of the August 26 modification violated the GCC statute of frauds because it was not in writing. This argument has no merit.

The GCC statute of frauds has been interpreted as setting forth three definite requirements for a writing to be sufficient as an enforceable contract: (1) the writing must evidence a contract for the sale of goods; (2) it must be signed by the party to be charged; and (3) it must specify a quantity. O.N. Jonas Co., Inc. v. Badische Corp., 706 F.2d 1161, 1163 (11th Cir. 1983); see also Ga. Code Ann. § 11-2-201. A contract for the sale of goods may be made in "any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Ga. Code Ann. § 11-2-204(1). Price, time and place of payment or delivery, general quality of the goods, or any particular warranties may all be omitted and supplied by course of trade or be agreed to on a later date, whether by an additional written instrument or by oral evidence.[6] Alice v. Robett

---

[6] The parties do not dispute that the contract in its form on August 21 satisfied the GCC statute of frauds. ARMA and Flowers Ginning intended to enter into a contract for the sale of a UD press and related equipment. ARMA signed a written instrument on August 21, which contained all the necessary indicia of a contract for the sale of goods, including specifying a quantity term. See Ga. Code Ann. § 11-2-201.

8

Mfg. Co., Inc., 328 F. Supp. 1377 (N.D. Ga. 1970), aff'd, 445 F.2d 316 (5th Cir. 1971).

Georgia case law is unclear as to whether an oral modification must be reduced to writing in order to satisfy the GCC statute of frauds. Like every other state that has adopted § 2-209 of the Uniform Commercial Code as its substantive law dealing with modification of a contract for the sale of goods, GCC § 2-209(3) states that "[t]he requirements of the statute of frauds section of [the GCC] must be satisfied if the contract as modified is within its provisions." Ga. Code Ann. § 11-2-209(3). As two notable commentators on the Uniform Commercial Code have said, "[t]he impact of this provision is not clear." James J. Wright & Robert S. Summers, Uniform Commercial Code § 1-6 at 56 (3d ed. 1988). The commentators recognize a split of authority among the states regarding possible interpretations, with one state interpreting the provision to require that if the original contract was within the statute of frauds section, then any modification thereof must also be in writing. Id. Other less stringent interpretations construe the provision as requiring a writing only if the modification brings the entire deal within the statute of frauds for the first time or if it changes the quantity term of the original contract. See id.

Georgia case law does not give us any guidance as to how we should interpret GCC § 2-209(3) for purposes of this litigation. We need not, however, forecast Georgia's interpretation. GCC § 2-209(4) provides that a modification can operate as a waiver of the right to assert a defense under the GCC statute of frauds, see Ryder Truck Lines, Inc. v. Scott, 201 S.E.2d 672, 675 (Ga. Ct. App. 1973), and that is the situation here. A modification may operate as a waiver if there is reasonable reliance. Wisconsin Knife Works v. Nat'l Metal Crafters, 781 F.2d 1280, 1287 (7th Cir. 1986); Trad Indus., Ltd. v. Brogan, 805 P.2d 54, 59 (Mont. 1991). The evidence in the record reveals conduct by ARMA and reliance by Flowers Ginning sufficient to estop ARMA from insisting upon enforcement of the original installation and operational deadline. See Irvin v. Lowe's of Gainsville, Inc., 302 S.E.2d 734, 736 (Ga. Ct. App. 1983) (when a promisee reasonably and foreseeably relies on a promise to his detriment, the promise is binding if injustice can by avoided only be enforcement of the promise). Accordingly, ARMA cannot take advantage of the GCC statute of frauds to bar evidence that it and Flowers Ginning orally agreed

9

to modify the contract to provide for an October 1 installation and operational deadline.

B.

The GCC parol evidence rule provides in pertinent part:

> Terms . . . which are . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (a) by a course of dealing or usage of trade or by a course of performance; and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Ga. Code Ann. § 11-2-202. Strongly contending that the contract did not become effective until August 27 when Flowers Ginning paid the earnest money, ARMA contends that the evidence supporting Flowers Ginning's contention that the parties orally modified the contract on August 26 to provide for an October 1 installation and operational deadline, rather than November 19, should have been excluded under the GCC parol evidence rule as evidence of a prior agreement that contradicted an express term of the written contract. We disagree.

Initially, we note that, notwithstanding ARMA's argument to the contrary, the magistrate judge properly determined that August 21 constituted the effective date of the contract. The contract provided that it "be exercised not before the expiration of 10 days nor after the expiration of 90 days from the date hereof." (J.A. 1275). Because the contract was signed by ARMA's president on August 21, 1991, that date constituted the "date hereof." Id. August 21 constituted the effective date of the contract despite subsequent language in the contract

10

that suggested the contract would not become effective until Flowers Ginning paid ARMA the earnest money. Specifically, the contract provided that "[t]he buyer shall consummate the purchase during said period by tendering the purchase price in the manner described above." (J.A. 1275). The contract called for $263,130 to be paid in earnest money that would be "credited against the purchase price when [the contract] is consummated." (J.A. 1274). At best then, the contract is ambiguous with respect to its effective date. Because ARMA prepared the contract, any ambiguity in its terms must be construed against it. See Considine Co. of Ga., Inc. v. Turner Communications Corp., 273 S.E.2d 652 (Ga. Ct. App. 1977). Thus, we cannot say that the magistrate judge erred by concluding that the contract became effective on August 21, the date ARMA's president signed the contract.[7]

Having concluded that the magistrate judge correctly determined that August 21 constituted the effective date of the contract, the GCC parol evidence rule loses all applicability to the evidence which ARMA argues was erroneously admitted. The GCC parol evidence rule bars admission of evidence of any "prior agreement[s]" or any "contemporaneous oral agreement[s]" which contradict the terms of the parties' final written agreement. Ga. Code Ann.§ 11-2-202. "[T]he parol evidence rule simply does not apply to evidence of subsequent agreements or modifications." Wright & Summers, supra at 98; see also Wayman v. Amoco Oil Co., 923 F. Supp. 1322, 1340 (D. Kan. 1996) ("The parol evidence rule (UCC§ 2-202) does not apply to evidence of subsequent agreements or modifications . . . ."); Muther-Ballenger v. Griffin Elec. Consul., 397 S.E.2d 247, 250 (N.C. Ct. App. 1990) (rejecting argument that the parol evidence rule under the North Carolina Commercial Code would bar plaintiff's evidence of oral modifications made subsequent to the written contract). Here, the oral modification occurred on August 26, a date subsequent to

_____

[7] ARMA also argues that, during his cross examination, Charlie Warren admitted that there was no contract between Flowers Ginning and ARMA until Flowers Ginning paid the earnest money. ARMA's argument is without merit. Our review of the record reveals that such an admission by Charlie Warren is far from clear, and cannot form a basis for concluding that the magistrate judge erred by determining that the contract became effective on August 21.

11

August 21, the effective date of the contract. Accordingly, the GCC parol evidence rule did not apply to bar Flowers Ginning's evidence that the parties agreed to orally modify the delivery and installation date from November 19, 1991 to October 1, 1991.

IV.

ARMA's last argument is that the magistrate judge erroneously concluded that Flowers Ginning presented sufficient evidence to support the damage award, beyond more than nominal damages, on the breach of contract claim. This argument has no merit.

Pursuant to Georgia law:

> [T]he measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which fulfillment of the contract would have prevented or the breach of it entailed. In other words, the person injured . . . is to be placed in the position he would have been in had the contract been performed.

Bennett v. Associated Food Stores, Inc., 165 S.E.2d 581, 585 (Ga. Ct. App. 1968); see also PMS Constr. Co., Inc. v. DeKalb County, 257 S.E.2d 285 (Ga. 1979). When items of claimed damages cannot be traced solely to the breaching party's breach, such items cannot be recovered. See Department of Transp. v. Arapaho Constr. Co., 349 S.E.2d 196 (Ga. Ct. App. 1986), aff'd, 357 S.E.2d 593 (Ga. 1987). Accordingly, at trial, Flowers Ginning bore the burden of furnishing sufficient evidence from which the jury could determine its damages with reasonable certainty. See Hospital Auth. v. Bryant, 277 S.E.2d 322 (Ga. Ct. App. 1981).

The record reflects that Flowers Ginning bore its burden of furnishing sufficient evidence from which the jury could determine with reasonable certainty that ARMA's breach of the contract caused Flowers Ginning to sustain total damages of $330,555 in both completion costs and lost profits. Linwood Wooten, Flowers Ginning's certified public accountant, testified as to the costs incurred by Flowers Ginning in order to get the UD press and related equipment installed and

12

operational. (J.A. 545-46). Wooten also testified about lost profits for the 1991 ginning season and for a period thereafter. (J.A. 544, 570-74, 939). The jury, having credited this testimony, leaves us in no position to disturb the jury's award of damages.

V.

For the reasons stated herein, we affirm the judgment entered by the court below.

AFFIRMED

WIDENER, Circuit Judge, dissenting:

I respectfully dissent because I believe the parol evidence rule bars evidence of the parol agreement to change the date set in the written contract.

13